IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| JUDY L. AUGHTRY, | ) | C.A. No. 3:07-1892-CMC-PJG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | **OPINION AND ORDER** |
| | ) | **GRANTING MOTION FOR** |
| RICHLAND/LEXINGTON SCHOOL | ) | **SUMMARY JUDGMENT** |
| DISTRICT 5, and ESTELLE SCOTT | ) | |
| GOODSON, and BENJAMIN MADDEN | ) | |
| in their individual capacities, | ) | |
| | ) | |
| Defendants.[1] | ) | |
| _____ | ) | |

Through this action, Plaintiff, Judy L. Aughtry ("Aughtry"), seeks recovery from her former

employer, Richland/Lexington School District 5 ("District") and two supervisory employees for

their allegedly unlawful termination of Aughtry's employment on October 6, 2006. Aughtry alleges

that her termination was racially motivated and, therefore, in violation of Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.* She also (or alternatively) alleges that the

termination was in retaliation for one or more of the following: (1) one or more report(s) she made

of racial discrimination (most critically a letter written in November 2004); (2) her reporting of

another District employee in 2005 for misappropriation of school funds; and (3) her filing of several

workers' compensation claims in January, August, and September 2006. Aughtry also seeks

recovery from the District for an allegedly racially-hostile work environment for the two-year period

predating her termination.

_____

[1] A fourth individual originally named as a Defendant, Angela Bain, has been dismissed with
prejudice by consent pursuant to Fed. R. Civ. P. 41(a)(1)(ii). *See* Dkt. No. 41.

The matter is now before the court on Defendants' motion for summary judgment.[2] For the reasons set forth below, the motion is granted in full.

**STANDARD**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987).

The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). When the nonmoving party has the ultimate burden of proof on an issue, the moving party must identify the parts of the record that demonstrate the nonmoving party lacks sufficient evidence. The nonmoving party must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

A party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995).

---

[2] This matter was initially assigned to a magistrate judge for pretrial proceedings pursuant to Local Civil Rule 73.02(B)(2)(e) and (g). The undersigned has elected to withdraw the reference in this matter and resolve the motion without a report and recommendation.

**FACTS**

Taken in the light most favorable to Aughtry, the non-moving party, the critical facts are as follows.

November 24, 1997

Aughtry, a Caucasian, began employment with the District, working as a cashier in the Irmo High School Cafeteria. Aughtry Dep. at 40-41. She was supervised by Cafeteria Manager Betty Warner. *Id.* at 43.

2000 or 2001

Aughtry was promoted to Assistant Cafeteria Manager. *Id.* at 42. Her duties as Assistant Cafeteria Manager were primarily administrative, although she occasionally helped out in the kitchen if needed. *Id.* at 43 (explaining that she handled "the money end, . . . office work and control, while Warner "made sure the kitchen ran"); *id.* at 78 ("Ms. Warner did the ordering and inventory. But I did production record, I handled the staff, absentees, anything clerical. . . . [If] we had people out and we did not have coverage, she would pull me to come out and help in the kitchen to do whatever [was] needed to be done.").

Aughtry continued to be supervised by Warner with whom she got along well. At no time did Warner issue any written corrections or institute any disciplinary action against Aughtry. Aughtry Dep. at 43-44. Based on this absence of discipline, her recollection of her employee evaluations ("not bad, they were very positive") and her own opinion of her work, Aughtry maintains that she was a model employee. *Id.* at 44-46.

Fall 2003

Defendant Estelle Scott Goodson ("Goodson"),[3] an African-American, began work for the District as a "floater," working as needed in various cafeterias within the District. *See* Aughtry Dep. at 77-78.[4]

_____

[3] Goodson also used the last names Scott and Scott-Goodson during the period at issue.

[4] In her deposition testimony, Aughtry sometimes confuses the year when Goodson first began work as a floater (2003-04 school year) with the year when Goodson took over as Cafeteria Manager (2004-05 school year). There does not, however, appear to be any genuine dispute that Goodson began work for the District as a floater during the 2003-04 school year and was promoted to Cafeteria Manager for Irmo High School at the beginning of the 2004-05 school year. *See, e.g.*, Goodson Aff. ¶ 1 (indicating she began the Cafeteria Manager position in July 2004).

| | |
|---|---|
| Spring-Summer 2004 | Warner retired in the Spring of 2004.[5] Both Goodson and Aughtry applied for the Cafeteria Manager position previously held by Warner. Goodson was selected. Aughtry Dep. at 79 & 83; Bain Aff. ¶¶ 4 & 7. The hiring decision was made by the School Principle, Gerald Witt, who is African-American, and Benjamin Madden ("Madden"), the District's Director of Food Services, who is Caucasian.[6] Madden Dep. at 52-53; Bain Aff. ¶ 5-7. |
| Late Summer 2004 | Goodson became Aughtry's supervisor at the beginning of the 2004-05 school year. *See supra* n. 4. Their interpersonal difficulties began even before the school year started when Goodson chastised Aughtry because pans were not put away after a school catering function. In the processing of criticizing Aughtry, Goodson commented to Aughtry and others that "doo-doo" rolled downhill. Aughtry Dep at 85-88. Aughtry understood the remark to mean that if there were negative repercussions for problems in the cafeteria, Goodson would place the blame on Aughtry. Aughtry responded to Goodson: "I'll roll it back uphill and it won't land on me." Goodson walked away rather than replying to Aughtry's remark. *Id.* at 87-88.[7] |

---

[5]   In her Amended Complaint, Aughtry alleges that Martha Carter ("Carter") was "instrumental in causing the resignation of [Warner] and the hiring of . . . Goodson[.]" She also alleges that Madden "work[ed] closely with Carter to bring . . . Goodson into her employment with the district[.]" Amended Complaint ¶¶ 17-18. In her deposition, however, Aughtry conceded that these allegations were based on her assumption that Carter, Goodson, and Madden were close personal friends and on the fact that Carter and Goodson had been involved in performing inventories at the school prior to Warner's departure. Aughtry Dep. at 230-32. Ultimately, she conceded that she was simply making an assumption both in regard to the nature of the friendships and any involvement by Carter in Warner's departure or Goodson's hiring. Aughtry Dep. at 232-33. There is, moreover, uncontradicted evidence that Warner, who was almost 80 at the time of her departure, retired voluntarily. *See* Madden Dep. at 50-51.

[6]  Aughtry opines that Goodson was selected because she was a friend of Madden. The only evidence of such a friendship is: (1) Madden knew Goodson when both previously worked for another school district; and (2) Goodson came to Madden, who had by then moved to District 5, when she lost her job at the other school district and asked him to "rescue her." There is, however, no evidence that the relationship between the two was anything other than a casual business relationship. *See* Aughtry Dep. at 62-63 (conceding that she had no direct evidence of any friendship between Madden and Goodson and that her belief that there was a strong friendship was based on rumors). In any event, there is no evidence that race played any part in Madden's (a Caucasian) selection of Goodson (an African-American) over Aughtry (a Caucasian).

[7]  While the fault and motivation for the problems may be disputed, all agree that the difficulties predicted by this early exchange continued throughout their working relationship. *See,*

Under Goodson's management, the cafeteria program was dramatically modified at the beginning of the school year, shifting from having four serving lines to having seven distinct serving areas which Goodson described as "miniature restaurants." This resulted in the total meals served per day increasing from 300-400 to about 1000 per day: a two to three-fold increase. Goodson Dep. at 134-35. It also resulted in a substantial increase in the workload for all staff members, including Aughtry. In addition, Goodson expected Aughtry to take on more non-administrative duties, including being able to fill in for Goodson in her absence. Goodson Dep. at 136-42.

From the outset, Aughtry and at least two other employees perceived Goodson's management style as being "rough," including arguing with, picking on, yelling at, or ridiculing employees. Aughtry Dep. at 150-51; Guerro Dep. at 12-16; and Lim Dep. at 29. At least some employees, including Aughtry, felt that Goodson was easier on some African-American employees, at least those who were Goodson's friends or relatives. Aughtry Dep. at 95, 97, 109-10; Lim Dep. at 30; and Guerro Dep. at 13.

September 28, 2004    Goodson wrote a reprimand for both Aughtry and another employee, Mary Livingston (also Caucasian), correcting both for an unprofessional dispute in front of students. The reprimand written for Aughtry notes, nonetheless, that Aughtry was correct in her interpretation of district policy.[8] Aughtry Dep. at 98-99, 157-58, 160-

---

*e.g.*, Aughtry Dep. at 88 ("[T]he whole time she was there, I couldn't do nothing right, in her opinion. I wasn't a team player, I caused friction, from the get-go, from the time she came there."); *id.* at 109 ("from the point blank she had it in for me. . . . I never did anything to the lady. I just – I don't know why she did the stuff that she did to me."); Goodson Dep. at 142 (responding to a query regarding whether Aughtry was reluctant to take on added duties by stating: "Anything I asked for her to do was always a question behind it, why."); *id.* at 144 ("[I]t was just like pulling teeth from her to try to get her to understand the process."); *id.* at 145-46 ("I tried to teach her how to use her time more wisely . . . . [S]he didn't like change"); *id.* at Ex. 4, p.3 (Goodson's February 2005 memorandum noting that she and Aughtry had "got[ten] off on the wrong foot" in their working relationship).

[8] The dispute related to whether a student who was in arrears on his cafeteria account should be allowed to receive a full lunch on credit or should be given only a sandwich. Aughtry insisted that the sandwich-only rule be followed.

63, Ex. 3 (written reprimand); Bain Aff. ¶ 13 (providing race).[9]

November 30, 2004      Aughtry and two employees of Asian descent or national origin wrote a letter to the District's Director of Human Resources, Mattie Dillon, raising multiple concerns regarding Goodson's management style and abilities. Of the ten listed areas of concern, four related to substantive areas such as food storage and whether adequate quantities were being ordered. Another two related to workplace safety issues. The remaining four related to Goodson's allegedly harsh management style including her comments that certain employees were "stupid and need psychological evaluation" and that "it takes a book to get someone fired from District Five." The ninth item stated that "[w]ork assignments are not properly or evenly distributed between the employees." Only the tenth, however, asserted any concern regarding racial disparity. That item stated, without elaboration, that "[r]acial discrimination is apparent in the working environment." Aughtry Dep. Ex. 1.

Questioned during her deposition about this letter, Aughtry explained that it was prepared with assistance from a representative at the South Carolina Education Association. Aughtry Dep. at 146. She indicated that the racial discrimination allegation was based on the three signatories' perception that Goodson "was targeting the whites, the Asian-Americans, the ones not African-American, almost like she was picking on us and discriminating against us." *Id.* at 151. *See also* Lim Dep. at 30 (indicating racial discrimination concern was based on allocation of work which she believed favored at least some of the African American employees).

The District responded to the letter by first setting up a meeting for each of the signatories with a District official. That official later followed up with each of the signatories after, apparently, meeting with Goodson. Aughtry Dep. at 152-53. Aughtry was initially satisfied with the District's response, although she felt Goodson ultimately did not follow through on improving her approach. *Id.* at 153 ("I was satisfied with the meeting and that [the District official]

_____

[9] Aughtry points to a comment made by Livingston in the course of this dispute as evidence of Goodson's animus toward Aughtry. Specifically, Aughtry asserts that Livingston stated that Goodson had previously stated that she (Goodson) wanted Aughtry's "fat ass gone." Aughtry Dep. at 162-63. No first-hand testimony has been offered in support of the claim that Goodson made this comment. Neither is there any evidence that, if the statement was made, it was racially motivated.

did seem to want to put an end to all this. But for some reason [Goodson] kept on pushing it back to the back burner and [it] kind of escalated."). To the extent Aughtry had any remaining concerns relating to racial discrimination, she did not make them known through any written complaints. *Id.* at 155.[10]

The District also retained a South Carolina Department of Education employee to conduct a management analysis. The conclusion of the analysis was "that the meals per labor hour [ratio] was within the standard frame . . . proper for high school" and "responsibilities were evenly distributed." Madden Dep. at 65-67. *See also id.* at 97-98 (stating that the analyst reported that Goodson "was even rotating responsibilities, which [was] an excellent method for cross training").

February 8, 2005      Goodson drafted a memorandum to Aughtry addressing "some serious problems concerning, [sic] the implementation of the new program and duties that have been assigned to you[.]" Aughtry Dep. Ex. 4 (listing eight specific areas of concern including failure to perform specific work duties, a general lack of enthusiasm and poor attitude regarding the changed format, failing to follow the chain of command, and being disrespectful to other employees). The memorandum warned that, unless Goodson saw significant improvements, she would "recommend . . . immediate dismissal . . . or for [Aughtry's] contract to not be renewed." The memorandum also included a detailed improvement plan. In concluding, Goodson expressed her "intent to assist [Aughtry] in improving her overall work performance." *Id.* at 2. Goodson also expressed her regret that she and Aughtry had "got[ten] off on the wrong foot" and had "not been on the best of terms" since Goodson's selection as cafeteria manager. *Id.* at 3.

February 28, 2005      Goodson sent Aughtry a short memorandum addressing concerns with Aughtry's failure to take proper action to notify Goodson when Aughtry learned of another employee's planned absence. Aughtry Dep. Ex. 2. The letter reminds Aughtry that she "need[s] to encourage the employees to follow the chain of command." *Id.*

---

[10] According to Lim, one of the three signatories, Goodson "change[d] a little" after these meetings: "Instead of screaming to everybody she comes nicely and tell you [what you need to do]." Still, "sometime she might scream, but like not as oftens as she used to do it, and then by the May of like this year [2008] and she start screaming at me again, too." Lim Dep. at 37. *See also* Lim at 38 (stating that it "seems like to me" that Goodson screams less at African-Americans).

| | |
|---|---|
| March 1, 2005 | The memorandum drafted on February 8, 2005, apparently was not delivered until March 1, 2005. *See* Aughtry Dep. Ex. 5. |
| March 7, 2005 | Aughtry responded to Goodson's February 8, 2005, memorandum. Her response challenged the validity of most if not all of Goodson's stated concerns and questioned Goodson's failure to raise the concerns in a less formal manner at an earlier time. Aughtry Dep. Ex. 5. For example, Aughtry stated that the assertion that she has been "disrespectful to other employees and [needed to] improve [her] attitude" was the first time she had "heard these terms in conjunction with [her] job performance." She also stated that these claims were "completely untrue." *Id.* at 3. |
| | Noting that she had not received any prior warning other than in relation to the incident on September 28, 2004, Aughtry stated: "Had I known that you had a problem with my performance I would have acted accordingly to correct any behavior that you feel has lead to an unpleasant work environment[.] I feel that I am being treated unfairly being on this [performance improvement] plan." As to Goodson's comment that the two had gotten off on the wrong foot, Aughtry states: "I find it hard to imagine why this is coming to light so far into the school year. I have only a problem with comments made about my job security being threatened and your derogatory comments made to and about other employees which prompted me to follow district policy in going to another supervisor about these problems as I feel my job security unsafe in coming directly to you."[11] |
| March 16, 2005 | Goodson responded with another memorandum and performance improvement plan which was nearly identical to the February 8 document. The most obvious difference is that this memorandum is copied to Witt (the School Principal), Dillon (Chief of Human Resources), and Madden (Director of Food Services). Aughtry Dep. Ex. 6. |
| April 2005 | Aughtry discovered that several deposits of cafeteria funds had not been made. She investigated further without informing Goodson of her concern, and determined that the failures occurred when District |

---

[11]  The response does not directly mention any concerns regarding racial discrimination, although the reference to an earlier complaint to "another supervisor" presumably refers to the November 30, 2004, letter which did include a reference to unspecified racial discrimination as the tenth area of concern.

employee Martha Carter had volunteered to make bank deposits for Aughtry. Aughtry Dep. at 210-29; Bain Aff. ¶ 29 and Ex. 9 (providing date of report). Again electing to bypass Goodson, Aughtry went to the District office to report her concerns and asked to speak to Dan Chandler. She ended up speaking to Tom Weeks, to whom she stated: "I really don't feel like I need to take this to Ben [Madden], *because I know that they've been trying to get me out of here.*" Aughtry Dep. at 218 (emphasis added); *see also id.* at 219 (stating she did not trust Madden "[b]ecause I know if him and [Goodson] and [Carter] was all together, they were all after me. . . . From the day [Goodson] came there, she was trying to get me out. Her and [Carter] both."). Weeks brought Madden into the investigation and advised Aughtry that she needed to follow the chain of command. Aughtry Dep. at 220.

A day or two later, Goodson advised Aughtry that Madden had informed her of the problem with the deposits. When Goodson asked why Aughtry had not brought the concern to her, Aughtry responded that she did not trust Goodson, further explaining: "you've been wanting me out of here for a long time. . . . [H]ow do I know that y'all weren't trying to set me up and trying to frame me with this." Aughtry Dep. at 223-24.[12] Aughtry has also indicated concerns based on a belief that Goodson and Carter were close friends.[13]

| | |
|---|---|
| November 9, 2005 | Several months into the next school year, a meeting was held between Aughtry, Goodson, and the school principal, Charles "Eddie" Walker ("Walker"), a Caucasian who had replaced Witt at the end of the 2004-05 school year. In this meeting, Aughtry agreed to follow the chain of command and Goodson's directives and to encourage other employees to do the same. Walker Aff. ¶¶ 6-8. Walker followed this |

---

[12] In her deposition, Aughtry indicated a belief that the District was involved in covering up Carter's embezzlement but offered no factual basis for this belief other than her subjective concerns based on the fact that she had never been interviewed by SLED and rumors that Carter (or someone else) had stated that others may have been involved. Aughtry Dep. at 224-25. Aughtry conceded that she did not know whether Carter pled guilty or was convicted of embezzlement, although she was aware from public records that Carter had been required to pay restitution. *Id.* at 224-28.

[13] The only evidence of any friendship between Carter and Goodson is based on Plaintiff's observation that the two appeared friendly at work and ate lunch together. Aughtry Dep. at 229-34 (conceding that she had no knowledge of any nonwork-related friendship). Goodson by contrast, testified that her social interactions with Carter were limited to work-related lunches and Carter's hosting of a dinner for floaters which Goodson attended in that capacity). Goodson Dep. at 93.

| | |
|---|---|
| | meeting with a letter summarizing the discussions and his expectations of Aughtry. Walker Aff. ¶ 9, Ex. 1. |
| January 7, 2006 | Aughtry suffered serious burns on her buttocks from strong chemicals which Goodson used in or on a toilet in the cafeteria area. Aughtry Dep. at 112-114. Aughtry filed a workers' compensation report or claim for the injuries. *Compare id.* at 112 (stating she did not file a claim) *with id.* at 115 (stating she filed a workers' compensation report). No one at the District discouraged Aughtry from filing this claim or made any negative comments to her about it. Aughtry Dep. at 115-16; *id.* at 131 (addressing all workers' compensation claims). |
| May 3, 2006 | Goodson issued a written reminder to Aughtry to follow established paperwork guidelines. Goodson Aff. ¶ 11. |
| August 16, 2006 | Goodson provided Aughtry with a job description and a "to do list" with an incorporated schedule. Aughtry went to Walker that same day with concerns about the job description and to do list. Goodson Aff. ¶ 4; Walker Aff. ¶ 10, Ex. 2. |
| August 20, 2006 | Aughtry sent Walker an e-mail, following up on the August 16, 2006, conversation. Walker Aff. ¶ 10, Ex. 2. Walker responded by reminding Aughtry to follow the chain of command and to discuss her concerns with Goodson prior to coming to him. *Id.* |
| August 21, 2006 | The following day, Aughtry discussed her concerns regarding the to do list and incorporated schedule with Goodson. Goodson responded in writing, advising that she wanted Aughtry to try the new schedule and see how it worked. Goodson Aff. ¶ 5 & Ex. 3. |
| August 22, 2006 | Aughtry slipped on a wet floor and injured her knee. She filed a workers' compensation claim as a result. Aughtry Dep. at 117. No one at the District ever made any negative comments to Aughtry about this claim. Aughtry Dep. at 131. |
| August 25, 2006 | Aughtry again questioned the to do list and incorporated schedule which Goodson wanted her to follow. Goodson Aff. n. 1 & Ex. 5. |
| | Goodson responded by issuing a reprimand which stated, *inter alia*, that Aughtry "need[ed] extra time, attention and direction," "ignore[d] legitimate authority or direction," had "difficulty communicating with other team workers," "constantly criticize[d] and ridicule[d] the job and . . . [her] supervisor," and had "problems with performance and being insubordinate." Aughtry Dep. Ex. 7. The |

letter concluded: "At this time I feel that Mr. Walker needs to address the issues listed above." *Id.*

September 5, 2006     Goodson counseled Aughtry regarding Goodson's perception that Aughtry was not a team player and was "deliberately . . . trying to hold back the cafeteria setup." Goodson Aff. ¶¶ 7-9. Goodson followed the counseling session with a letter summarizing her concerns. Goodson Aff. Ex. 6. This meeting was apparently followed by a meeting with Walker. *See* Walker Aff. ¶ 11 (referring to meeting on September 6, 2006); Aughtry Dep. at 178-85 (indicating confusion as to whether and when a meeting took place with Walker).

September 12, 2006    Goodson sent Aughtry two additional memos relating to Aughtry's alleged failure to file paperwork properly and an improper food storage incident. Goodson Aff. ¶ 11, Ex. 7.

September 14, 2006    Aughtry fell again, injuring her knee, head, and wrist. Aughtry Dep. at 118-20.[14] The doctor initially gave her clearance to return to work but advised her orally that she should not squat, stoop, bend, or kneel. *Id.* at 121-23. Aughtry first discussed these unwritten limitations with District employee Sue Evans, who advised Aughtry that she could not return to her job with limitations. *Id.* at 122-26. Aughtry then obtained the doctor's approval to return to work without limitation based on the doctor's understanding that Aughtry's duties would not normally entail the limitations. *Id.* at 123-24.

Aughtry, nonetheless, advised Goodson of the doctor's oral limitations. *Id.* at 126. When Goodson stated that Aughtry could not return with limitations, Aughtry responded that she would take a personal day the following day to "get some stuff together." *Id.* at 126-27.[15]

September 18, 2006    Aughtry filed a grievance with the District Superintendent, Dr. Scott

_____

[14] Aughtry may not have filed a new workers' compensation claim for this injury as it involved exacerbation of an injury for which she already had a claim pending. *See* Aughtry Dep. at 129-30 (denying that she filed a *new* claim).

[15] In her opposition memorandum, Aughtry asserts that she "informed Goodson that she would take a personal day *to discuss the situation with her workers' compensation attorney.*" Dkt. No. 57 at 5. The cited deposition pages do not, however, support her claim that she *advised Goodson* of her intent to use the day to meet with her attorney. Instead, she testified only that she used the day for this purpose. Aughtry Dep. at 126 (stating she advised Goodson she was "going to take a personal day and get some stuff together); *id.* at 127 (stating that she "went to talk to a workman's comp lawyer").

Anderson ("Anderson"), who is Caucasian, complaining of Goodson's treatment. She listed a series of specific events which occurred on seven separate days in August and September which she maintained were harassing, demeaning, belittling, or otherwise inappropriate. Aughtry characterized the incidents as amounting to a "hostile environment," but did not attribute the hostility to any racial animus. Neither did she suggest that the problems were the result of any retaliatory motive. Walker Aff. ¶¶ 12-13, Ex. 3.

September 21, 2006     Aughtry's grievance was rejected for failure to comply with the grievance procedure, specifically raising the concerns first with her immediate supervisor. Walker Aff. ¶ 14, Ex. 4 (letter written by Bain). The letter rejecting the grievance also noted that: "A supervisor has the authority to point out concerns verbally and in writing to employees in an effort to maintain work flow." Walker Aff. Ex. 4.

September 27, 2006     Aughtry again slipped on a wet floor at work, reinjuring her knee. She then sat down at a desk. Goodson, either indifferent to or unaware of Aughtry's injury approached Aughtry asking whether her cafeteria line was set up and ready to go. Aughtry Dep. at 185-86. A negative and possibly heated exchange followed, which, according to Aughtry, nonetheless involved Goodson's implicit approval of Aughtry's departure for the day. *Id.* at 186-89.[16]

Goodson, however, reported Aughtry to her superiors, characterizing Aughtry's departure as unauthorized and the conversation between them as being disrespectful and insubordinate on Aughtry's part. *See* Bain Aff. Ex. 6.

September 28, 2009     When Aughtry returned to work the following day, she was placed on administrative leave with pay pending an investigation into the incident. Bain Aff. ¶ 18, Ex. 4, Ex. 5.[17] The earlier of the two letters advising her that she was being placed on administrative leave indicated that a hearing would be held on October 3, 2006. Bain Aff. Ex. 4.

The investigation was conducted by Bain, Madden, and Walker, all

---

[16] Aughtry admits that she was upset and pushed back from the desk in her chair but denies Goodson's claim that she hit the desk or acted belligerently or disrespectfully towards Goodson. Aughtry Dep. at 190-93.

[17] The second letter refers to a meeting with Aughtry held earlier that day. It also sets out the specifics of the allegations being investigated. Bain Aff. Ex. 5.

of whom are Caucasian. Bain. Aff. ¶ 19. Goodson, who does not have authority to terminate her subordinates (Bain Aff. n. 1; Goodson Dep. at 123), participated by providing a short, typed report which characterized the incident as follows:

> Judy [Aughtry] hit her desk forcefully with her hands and responded, "You people can't be telling me what to do." Judy then responded, "I am leaving, I don't have to put up with this, I will take this higher, what do you want me to do, what is Margaret doing.["] She then said, "She is sick and tired of me and that she does not have to take this and that she is going to the state." She then called someone on the phone and walked out telling me that I better call Ben [Madden] and the superintendent because she [is] getting a lawyer and that I will go down.

Bain Aff. Ex. 6.

Three other employees, all of whom are African-American, gave short, handwritten statements generally supporting Goodson's version of events, although in less detail. Bain Aff. Ex. 6; Aughtry Dep. at 197 (testifying that supporting statements were all given by African-American women who were friends of Goodson).

| | |
|---|---|
| October 2, 2006 | The day before the scheduled hearing, Aughtry submitted a written statement setting forth her version of events which differed dramatically from Goodson's version. Bain Aff. Ex. 7. In this document, Aughtry noted that her problems with Goodson "have been going on since the day that Mrs. Goodson has walked in the door [a]t Irmo High School Cafeteria." *Id.* She continued: "I have given some thought in this and the only thing I can think of is that maybe Mrs. Goodson is retaliating against me for the fact that I was the person that found the embelzzement (sic) that Mrs. Carter was charged with. As Mrs. Goodson and Mrs. Carter were friends." *Id.* No claim of race discrimination or other retaliatory motive was mentioned in this letter. Aughtry may, however, have raised a race-based discrimination concern during the subsequent pre-termination hearing, although this is not mentioned in the written documentation. *See* Madden Dep. at 67 (stating that the first he heard of any claim of racial discrimination was at the pre-termination hearing). |
| October 3 or 5, 2006 | The pretermination hearing was conducted after receipt of Aughtry's |

written submission.[18]  Bain, Madden, and Walker considered the above statements from Goodson, Aughtry, and her co-workers, as well as Aughtry's personnel file, and work history.  After considering this evidence, they came to the collective decision that Aughtry should be terminated.  Bain Aff. ¶ 25 (indicating collective determination that Aughtry should be terminated based on the September 27 incident as well as her "unimpressive history of nonperformance"); Walker Aff. ¶ 16 (stating that the three determined that Aughtry's September 27, 2006, conduct "coupled with almost two years of documented performance problems (including her opposition to Ms. Goodson's authority), warranted . . . termination").

October 6, 2006

Aughtry was informed by letter that she was being terminated effective October 6, 2006.  Aughtry Dep. Ex. 8.  The letter read, in part, as follows:

> During [the October 5, 2006] hearing, we discussed that you have been on an improvement plan since February 2005 and previous to that as early as 2004, your performance has been in question.  Most recently, you did not obey directives from your immediate supervisor during an incident on September 27, 2006.  You left your job five minutes before students were to come in for lunch and without your supervisor's permission.  You stated as you left that you were "getting an attorney and going to the state."  After a review of your file, I have discovered that you have previous incidents of unprofessional conduct and that you have been counseled about your performance in conversations and in writing.
>
> . . . Your pattern of unprofessional behavior and insubordination is unacceptable to the District.  I regret that this action had to be taken, but I am convinced that at this time your employment would not serve the best interests of [the District.]

Aughtry Dep. Ex. 8.

October 18, 2006

Aughtry filed a grievance with the District challenging her

---

[18]  Some of the witnesses indicate the hearing or pre-termination meeting occurred on October 3, 2006, while others give the date as October 5, 2006.

termination. Walker Aff. ¶ 17 & Ex. 5 (grievance letter addressed to Walker). In her "Grievance Request," Aughtry first asserted that her "termination was based on retaliation by [Goodson] for filing a grievance against her prior to this termination recommendation on September 28, 2006." Walker Aff. Ex. 5 at 1. Aughtry also stated that "Goodson treated me not only in an unprofessional manner but singled me out for detrimental treatment." *Id.* Aughtry also challenged Goodson's version of what transpired on September 27, 2008. She concluded: "I feel that I was treated in an unfair manner and terminated in a retaliatory manner." *Id.* at 2. No mention is made of racial discrimination or retaliation on any basis other than for the earlier grievance against Goodson.[19]

October 23, 2006    Aughtry wrote to the District Superintendent, Anderson, regarding her grievance. Bain Aff. Ex. 9. In this letter she reiterated that she had not been insubordinate and stated a belief "that Mrs. Goodson has retaliated against me for the fact that I was the one that found the embelzzement (sic) in April 2005." Her stated basis for this belief was that she "was informed by a district floater that Mrs. Carter had stated that she was not the only one involved and that my name was brought up." *Id.* She asserts that she informed Goodson and Madden of what she was told by the floater and that since that report "Mrs. Goodson has belittle[d] me and has harass[ed] me[.]" She further stated that she knew "that Mrs. Goodson, Mr. Madden and Mrs. Carter were all friends." The remainder of the letter addressed the events on September 27, 2006, and Plaintiff's opinion of her work history.

October 24, 2006    Aughtry wrote another letter to Anderson, with the stated purpose of "set[ting] forth the truth in evidentiary form." Bain Aff. Ex. 13-M at 7-8. This letter stated that the termination "was inappropriately motivated, ill-timed, based on hearsay and secondhand evidence, and was precipitated by intimidating remarks that [were] clearly unprofessional, unwarranted, and based on personal attitudes and feelings that were incongruent and completely unprofessional." Aughtry also stated that, "over a period of several months," Goodson made "inflammatory, demeaning, and unnecessarily critical remarks

---

[19]  The only earlier grievance against Goodson was filed with the District (directed to Dr. Anderson) on September 18, 2006. This grievance was rejected on procedural and other grounds on September 21, 2006. As noted above, that grievance complained of a hostile environment resulting from Goodson's harassing, demeaning, belittling or otherwise inappropriate behavior. It did not attribute the hostility to any racial animus or retaliatory motive.

– unfounded and not substantiated by the facts – that were not in accord with professional behavior" and were "based on a personal dislike for me, *or some other factor, is not clear*. What is clear is that the remarks were made over a period of time and resulted in creating a hostile relationship between the two of us[.]" *Id.* at 8, ¶ 3(emphasis added). Aughtry identified two specific remarks made by Goodson as "typical": (1) "You need to keep my desk cleaned off – you work for me!"; and (2) "I thought you had sense enough to adjust your schedule." *Id.* at ¶ 4. Aughtry proceeded to disavow that she harbored any animosity towards Goodson, then raised questions regarding Goodson's character based on Goodson's earlier termination from another district and expressed concerns as to the "political complexities" of working for the District. Nowhere, however, did she suggest that the basis of any hostility was the result of racial animus or specific retaliatory motive.

| October 24, 2006 | Anderson held a post-termination hearing on Aughtry's grievance. Following the hearing, Anderson informed Aughtry by letter that her termination was being upheld "based on [your] history of evidence of poor performance, insubordination, and finally, the fact that you walked off of your job without permission on September 27, 2006." Walker Aff. Ex. 6. Anderson expressly stated that he found "no evidence to support your contention of retaliation . . . by your supervisor or anyone else in the district." *Id.* |

| October 27, 2006 | Aughtry wrote to Anderson requesting that her grievance be heard by the Board of Trustees. Bain Aff. Ex. 13. Attach. N. at 3. She listed three questions to be presented to the Board: (1) whether she could "be terminated in retaliation for filing a grievance against [her] supervisor and reporting inappropriate accounting procedures"; (2) whether she should "be subject to intimidation and discrimination by [her] supervisor including a recommendation of termination; and (3) whether she could be terminated for insubordination . . . when [her] supervisor directed [her] to contact Subfinder in addressing [her] request to leave based on an injury due to a fall at work." Although this letter references discrimination, there is no indication as to the basis of that discrimination (*i.e.*, race). |

| November 7, 2006 | Aughtry filed an administrative charge with the South Carolina Human Affairs Commission ("SHAC") and the Equal Employment Opportunity Commission ("EEOC") alleging that her termination was |

the result of racial discrimination.[20]  Bain Aff. Ex. 11 at 2.  In the box headed "Discrimintion Based On," Aughtry checked only the box for "Race," not the separate box for "Retaliation."  The "Particulars" included the following statements:

> III.  I contend that my termination is a pretext. Prior to my termination, I complained that I was being subjected to discriminatory actions because of my race.
>
> IV.  I therefore believe that I have been discriminated against because of my race (white) in violation of [state and federal law].

*Id.*

| | |
|---|---|
| November 28, 2006 | The Board denied Aughtry's request for a hearing.  Bain Aff. Ex. 13-L, Ex. 13-N. |
| December 1, 2006 | The District was notified by the EEOC of Aughtry's administrative charges.  The notification document indicated only a charge of race discrimination. Bain Aff. Ex. 11 at 1.  The box for retaliation was not checked. *Id.* |
| February 1, 2007 | The District responded to the administrative charges, giving the same reasons as provided in Aughtry's termination letter. |
| Unknown date | Aughtry was replaced by a white female.  Goodson Aff. ¶ 13.  No date is provided for when this replacement occurred other than that it was "upon [Aughtry's] termination." |

## DISCUSSION

### I.  Title VII Claim

Although pled as a single cause of action, Aughtry's Title VII claim appears to have three distinct components including claims for disparate treatment, hostile environment and retaliatory termination.  *See* Amended Complaint ¶ 10 (alleging that Aughtry was "repeatedly harassed and

---

[20]  In her deposition, Aughtry also opined that Goodson was particularly rough on Aughtry because Goodson felt Aughtry was trying to take Goodson's job.

threatened [and] subjected to disparate treatment from black cafeteria workers" while "under the supervision of Goodson" and that "[a]fter her complaints of mistreatment and racial discrimination, she was pretextually fired from her position for racial reasons"). For reasons addressed below, the Title VII claim fails as to each of these components.

### A.      Disparate Treatment – Racially-Motivated Termination

"The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000) (stated in context of an Age Discrimination in Employment ("ADEA") case). "Liability in a disparate-treatment case 'depends on whether the protected trait . . . actually motivated the employer's decision." *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003) (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)).

Aughtry seeks to establish that her termination was the result of disparate treatment on the basis of race through the indirect proof, burden-shifting scheme set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). To satisfy this proof scheme, Aughtry must establish four elements: (1) she was a member of a protected class; (2) she suffered an adverse employment action (here termination); (3) she was performing at a level that met her employer's legitimate job expectations at the time of the adverse employment action; and (4) the position remained open or was filled by someone with comparable qualifications from outside plaintiff's protected class. *Hill v. Lockheed Martin Logistics Management, Inc.*, 354 F.3d 277, 285 (4th Cir. 2004) (stating elements in context of a Title VII termination claim); *McDonnell Douglas*, 411 U.S. at 802 (stating elements in context of a Title VII failure-to-promote claim).

The fourth prong may, alternatively, be established by showing that the alleged adverse action occurred under other circumstances which would "eliminate the inference of

nondiscrimination" that normally arises from replacement by someone within the same protected class. *Miles v. Dell, Inc.,* 429 F.3d 480, 488 (4th Cir. 2005). For example, in *Miles* the court recognized that the inference of nondiscrimination would not be present if the "firing and replacement hiring decisions were made by different decisionmakers." *Id.* at 485.[21] In reaching this conclusion, the court cited to *Brown v. McLean*, 159 F.3d 898, 905 (4th Cir. 1998), in which the court acknowledged the possibility of exceptions to the usual fourth prong requirements and gave hypothetical examples such as where (1) an age discrimination plaintiff is replaced by a much younger person within the same class; (2) a significant lapse of time occurs between the adverse employment action and the decision to hire another person; and (3) the employer's hiring of another person within the protected class is calculated to disguise its act of discrimination).[22]

If Aughtry establishes a *prima facie* case, the burden of production shifts to the District to articulate a legitimate, nondiscriminatory reason for the adverse action. *Hawkins v. Pepsico, Inc.*, 203 F.3d 274, 278 (4th Cir. 2000). If the District meets this burden of production, the burden shifts back to Aughtry to prove that the District's proffered reason was mere pretext and that the real reason for the adverse action was race. *Id.*

***Prima Facie* Case.** For purposes of summary judgment, it is undisputed that the evidence supports the first two elements of the *prima facie* case. The District argues that the third element is not satisfied because the only relevant proffered evidence is Aughtry's subjective belief that she was meeting her employer's legitimate expectations at the time of her termination. *See* Dkt. No. 44-

---

[21] No evidence as to who made the replacement hiring decision has been offered in this case.

[22] The last element may also be established by showing that employees outside the protected class were retained under similar circumstances. *Hughes v. Bedsole*, 48 F.3d 1376, 1383 (4th Cir. 1995). No such allegation is, however, made in this case.

2 at 20-21 (*citing*, *e.g.*, *Hawkins*, 203 F.3d at 279-80 and *King v. Rumsfield,* 328 F.3d 145, 149 (4th Cir. 2003)) in support of the District's argument that such a subjective self-assessment is insufficient as a matter of law to establish the third element).  As the District notes, this evidence is also contradicted by nearly overwhelming evidence to the contrary.  *See id.* at 20-21

The court need not, however, decide whether Aughtry's own testimony is enough to create a genuine issue of material fact as to the third prong of her *prima facie* case, that is, whether she was meeting her employer's legitimate expectations.[23]  This is because Aughtry clearly cannot establish the fourth element of her *prima facie* case because she was replaced by a member of the same class (Caucasian) and there is no other proffered evidence that would tend to disprove the presumption of nondiscrimination which arises from replacement by a member of the same class (or, alternatively stated, other circumstances that would raise a reasonable inference of unlawful discrimination).

Aughtry concedes that she was replaced by a Caucasian but suggests that an inference of discrimination is raised because the "position remained open after her termination for a period of time."  Dkt. No. 57 at 10 (citing *Miles v. Dell, Inc*., 429 F.3d 480, 486-87 (4th Cir. 2005)).  The

---

[23]  The District is correct in relying on *King* with respect to the third element of the *prima facie* case.  *See King*, 328 F.3d at 149 (holding that "King's own testimony, of course, cannot establish a genuine issue as to whether King was meeting [his employer's] legitimate expectations" and stating that the Fourth Circuit has "long rejected the relevance of [co-worker opinion] testimony and held it to be insufficient to establish the third required element of a prima facie discrimination case").  It is, however, of some concern to this court that the cases relied on by *King* addressed the issue of pretext rather than the third prong of the *prima facie* case.  *See Hawkins*, 203 F.3d at 279 (focusing not on Hawkins' actual performance, but on whether there was evidence that the decisionmaker "actually believed [Hawkins'] performance was good").  The same is true for each of the four cases cited in *Hawkins* in the critical section of the opinion.  *See id.* at 280 (citing *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 960-61 (4th Cir. 1996)); *Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir. 1980); *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (citing *Conkwright v. Westinghouse Elec. Corp.*, 933 F.2d 231 (4th Cir. 1991))).

cited evidence, however, only supports the conclusions that Aughtry was terminated on October 6, 2006 (Bain Aff. ¶ 3) and that she was, at some point, replaced by a "white female" (Goodson Aff. ¶ 13). Aughtry offers no evidence as to when her replacement was hired or promoted from within. Neither does she suggest any evidence that different individuals were involved in the hiring decision than were involved in her hiring.

Aughtry also argues that "[e]ven if the lapse of time is not considered significant," an inference of discrimination may follow because "[t]he District was well aware of the possibility of a suit and race discrimination problems surrounding such a suit." Dkt. No. 57 at 10. In support of this claim, Aughtry points to the letter she and two other employees sent to the District's Director of Human Resources in November 2004. She also asserts that she "filed a grievance as well as wrote several letters all of which discuss the unfair and retaliatory nature of her termination." Dkt. No. 57 at 10 (citing Bain Aff. Ex. 7-9).

This proffered evidence does not support a reasonable inference of racial discrimination for several reasons. First, only one of the referenced documents expressly alleges any racial discrimination. That document was sent in November 2004, nearly two years before Aughtry's termination. It alleged, without elaboration, that "racial discrimination is apparent in the working environment." The three employees who wrote this letter have since clarified that the allegation, which was the last in a list of ten concerns, referred to apparent disparities in workload allocation and that Goodson seemed to be "picking on" the non African-Americans. Aughtry Dep. at 151; Lim Dep at 30. Those concerns were fully addressed by the District soon after the letter was sent including through meetings between the signatories and District officials and through an audit conducted by an employee of the South Carolina Department of Education. Aughtry Dep. at 152-53; Madden Dep. at 65-67, 97-98.

There is no evidence that Aughtry, thereafter, made any written complaint relating to racial discrimination prior to being terminated, despite her multiple written and oral complaints relating to Goodson's management style and practices. *See* Aughtry Dep. at 155. For example, Aughtry did not mention racial discrimination in the grievance she filed against Goodson in the month preceding her termination. Walker Aff. Ex. 3 (grievance filed September 18, 2006, asserting that Goodson's treatment was harassing, demeaning, and belittling, and amounted to a hostile environment, but not alleging racial discrimination). Neither did she mention racial discrimination in the letter she sent in defense of her continued employment just prior to her termination. Bain Aff. Ex. 7.

There is, moreover, no evidence that Aughtry made any other oral complaint expressly relating to racial discrimination between November 2004 and when she was placed on administrative leave on September 28, 2009, immediately predating her termination. The only indication of any reference to racial discrimination at the latter point is Madden's testimony that he first heard any claim of racial discrimination at the pre-termination hearing. Madden Dep. at 67.

Despite Aughtry's apparent mention of racial discrimination during her pre-termination hearing, she did not mention this concern in any of her multiple written challenges to termination (filed both before and after the decision was made). Instead, she suggested multiple possible improper motivations on Goodson's part. Walker Aff. Ex. 5 (grievance letter suggesting that termination was the result of Goodson's retaliation against Aughtry for filing a grievance); Bain Aff. Ex. 9 (first letter to Anderson suggesting termination was the result of Goodson's retaliation for Aughtry's reporting of Carter's embezzlement); Bain Aff. Ex. 13 Attach. M (second letter to Anderson complaining of Goodson's "inappropriately motivated" report, earlier "inflammatory, demeaning, and unnecessarily critical remarks" and other interpersonal difficulties, but not

mentioning racial discrimination as a motive). Although Aughtry made allegations of hostility or discrimination in these documents, those claims were generic in nature, focusing on non-race-based interpersonal difficulties she experienced with Goodson.

What minimal reference Aughtry made to racial discrimination prior to her termination or in her grievance papers filed soon after her termination is, therefore, insufficient to support an inference that the District should have anticipated a racial discrimination suit immediately after Aughtry's termination (the earliest point at which a replacement might have been hired). This is particularly true in light of the multiple other improper motivations suggested by Aughtry in her written grievance and related documents.[24] Without a reasonable inference that the District anticipated a race discrimination suit at the time Aughtry's replacement was hired, there would be no reason for it to hire a Caucasian to preemptively defeat Aughtry's *prima facie* case.

The possibility of a racial discrimination suit would, of course, have become obvious when the District was notified that Aughtry had filed an administrative charge of racial discrimination. That charge was filed on November 7, 2006, and served on the District on or after December 1, 2006. Bain Aff. Ex. 11. The record is, however, silent as to when the hiring decision was made. There is, therefore, no factual basis on which to rest an inference that the District was aware that Aughtry had filed an administrative charge of discrimination at the time that hiring decision was made or the further inference that this knowledge influenced the hiring decision. *See generally Autry v. North Carolina Dep't of Human Res.*, 820 F.2d 1384, 1386 (4th Cir. 1987) ("[T]he fact-finder must not be permitted to engage in surmise and conjecture but rather causation must be shown

---

[24] Aughtry has presented no evidence as to who made the decision to hire her replacement. There is, consequently, no evidence as to the knowledge and motivation of the specific person or persons who made that hiring decision.

by probability rather than mere possibility.")  Aughtry cannot, therefore, satisfy the fourth element of her *prima facie* case by relying on the alternative proof allowed in *Miles*, 429 F.3d at 486-87.

    **Pretext.**  Even if Aughtry could establish the fourth prong of her *prima facie* case, her claim of discrimination would fail because the District has proffered a legitimate, nondiscriminatory reason for the termination and Aughtry has failed to proffer evidence which might establish that those reasons were pretextual.  The District has been consistent in its stated reasons for Aughtry's termination: poor performance, insubordination, and leaving work without permission.  The three individuals who made the termination decision were presented with evidence which strongly supported these grounds for termination.  This evidence included documented performance deficiencies in Aughtry's personnel file, and witness statements from Goodson and three other witnesses.

    Aughtry offered both oral and written statements to the decisionmakers contradicting Goodson and her supporting witnesses' characterization of the events of September 27, 2006.  She also challenged characterizations of her performance as reflected in her personnel file (mostly, if not entirely, as reported by Goodson).

    These challenges might present a jury question if the issue was whether Goodson or Aughtry's versions of Aughtry's performance and the events of September 27, 2006, was true.  That is not, however, the issue for purposes of a pretext determination.  Rather, the issue is whether the legitimate nondiscriminatory reasons given by the three decisionmakers (Bain, Madden and Waters) for their termination decision were their true reasons.  *See generally Hawkins,* 203 F.3d at 279 ("[W]hen an employer gives a legitimate, non-discriminatory reason for discharging the plaintiff, 'it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so

long as it truly was the reason for the plaintiff's termination.' *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir.1998)").

Aughtry has failed to proffer any evidence that the reasons given by the District and its three decisionmakers were not their true and only reasons for terminating Aughtry. There is, likewise, no evidence that any of the three decisionmakers, all of whom are Caucasian, harbored any racial animus against Aughtry.[25]

For the reasons set forth above, the disparate treatment (termination) component of Aughtry's Title VII claim fails both because she has failed to establish the fourth prong of her *prima facie* case and because she has failed to proffer evidence that the legitimate, nondiscriminatory reasons given for her termination were not the true reasons relied on by the decisionmakers. Defendants' motion for summary judgment is, therefore, granted as to this aspect of Plaintiff's Title VII claim.

### B. Hostile Environment

To prove her hostile environment claim, Aughtry must show that she was subjected to "racial harassment 'sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Hawkins,* 203 F.3d at 281 (quoting *Harris v. Forklift Sys., Inc.,*

---

[25] For reasons addressed below in regard to Aughtry's hostile environment claim, the evidence is insufficient to show that Goodson's alleged mistreatment of Aughtry was because of Aughtry's race. In any event, even if Goodson was targeting Aughtry because of racial animus, there is no evidence that the ultimate decisionmakers acted as mere rubber stamps of Goodson's complaints. *See generally Hill v. Lockheed Martin Logistics Management, Inc.*, 354 F.3d 277, 289-90 (4th Cir. 2004) (discussing cat's paw theory of liability but "declin[ing] to endorse a construction of the discrimination statutes that would allow a biased subordinate who has no supervisory or disciplinary authority and who does not make the final or formal employment decision to become a decisionmaker simply because he had a substantial influence on the ultimate decision or because he has played a role, even a significant one, in the adverse employment decision").

510 U.S. 17, 21 (1993)). The challenged conduct must be both objectively hostile or abusive and must be perceived by the plaintiff to be hostile or abusive. *See*, *e.g.*, *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008). As the Fourth Circuit recently explained, to preclude summary judgment, Aughtry must proffer evidence from which "a reasonable jury [could] conclude that the harassment was (1) unwelcome, (2) based on . . . race, (3) sufficiently severe or pervasive to alter the conditions of her employment and create an abusive atmosphere, and (4) imputable to [her employer."[26]

In determining whether the environment was objectively hostile or abusive, the fact finder considers "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. General complaints of rude treatment are not enough to support a claim of racially-hostile environment. *Baqir v. Principi*, 434 F.3d 733, 747 (4th Cir. 2006). Neither are isolated or trivial actions. *Carter v. Ball*, 33 F.3d 450, 461 (4th Cir. 1994). Likewise, the mere fact that a supervisor has an unpleasant management style does not give rise to a hostile environment claim, even where it is apparent that personal animosity is part of the reason for harsh treatment, absent proof of racial motivation. *Hawkins*, 203 F.3d at 281 (holding that complaints about a supervisor's management style were not enough to support a claim of hostile environment as it was "for [the employer], not the courts, to rule on the wisdom and

---

[26] *See also Hampton v. Conso Products, Inc.*, 808 F. Supp. 1227, 1236 (D.S.C. 1992) (stating elements as follows: (1) she was subject to unwelcome harassment in a work-related setting; (2) the harassment complained of was based on race; (3) the harassment, viewed from both a subjective and objective perspective, was so severe or pervasive that it affected a term, condition, or privilege of employment; and (4) the employer either knew or should have known of the harassment and took no effective remedial action).

generosity of the [supervisor's] management practices."). Finally, the proof of a hostile environment may not rest on general allegations of mistreatment but must be "substantiated by accounts of specific dates, times [and] circumstances." *Carter*, 33 F.3d at 461.

Aughtry's evidence of a "hostile environment" is general in nature and involves actions and attitudes which, at most, establish an unpleasant working environment.[27] Those actions and attitudes are not sufficient to support a finding that the alleged harassment was "'sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment.'" *Hawkins*, 203 F.3d at 281 (quoting *Harris*, 510 U.S. at 21); *see also id.* at 282 (noting that "[p]ersonality conflicts and questioning of job performance are unavoidable aspects of employment" from which Title VII provides no protection).

Aughtry has, likewise, failed to present evidence that she was treated more harshly than others *because of her race*. Aughtry points to various unwelcome or unpleasant comments made by Goodson over the two-year period predating Aughtry's termination. *See* Dkt. No. 57 at 10-11. While arguably harsh or unfair, none of the comments included any reference or allusion to race or racial animosity. Instead, the comments suggest simply that Goodson and Aughtry did not get along. The mere fact that the two individuals were of a different race is not enough to support an inference of racial discrimination. *See Hawkins*, 203 F.3d at 282 ("Law does not blindly ascribe to race all personal conflicts between individuals of different races. To do so would turn the workplace into a litigious cauldron of racial suspicion. Instead, legally sufficient evidence is required to transform an ordinary conflict (between supervisor and employee) into an actionable claim of

---

[27]  For purposes of this order, the court presumes that Aughtry has proffered sufficient evidence to satisfy the "subjective" component of her case which is stated in *Sunbelt Rentals* as proof of "unwelcome" conduct.

discrimination.").

Aughtry has, herself, suggested many possible non-race-based reasons for the difficulties she experienced with Goodson including that Goodson may have believed that Aughtry "was trying to take her job." Aughtry Dep. at 108. This possibility is consistent with Aughtry's claims that Goodson targeted Aughtry "more than anybody else in the cafeteria, whether they were white or black." Aughtry Dep. at 107. *See also* Dkt. No. 44-2 at 24 (Defendants' memorandum reciting evidence of other motives).

Finally, Aughtry has not presented evidence that "the employer either knew or should have known of the harassment and took no effective remedial action." *Hampton*, 808 F. Supp. at 1236. The only evidence of any written report (or even any oral reports before Aughtry was placed on administrative leave) that included an allegation of racial discrimination or hostility was the November 2004 letter. The District responded promptly and appropriately to this report. Aughtry and one of the other authors of the letter confirmed that things improved, at least for awhile, after the District's response. *E.g.*, Aughtry Dep. at 152-53; Lim Dep. at 37. In any event, Aughtry did not, thereafter, report any concern regarding a racially-hostile environment at least until the time of her pre-termination hearing and then, only orally (although she did, on more than one occasion, make generic allegations of a hostile or discriminatory environment without ascribing the motivation to race or any other characteristic protected under Title VII). Lim Dep. at 37; Aughtry Dep. at 155; Madden Dep. at 67.

Aughtry's hostile environment claim, therefore, fails because she has failed to proffer evidence sufficient to show that the environment was objectively hostile or abusive or that any hostile or abusive treatment was based on race. She has also failed to present evidence which would allow a jury to attribute the hostile environment to her employer. Defendants' motion for summary judgment is, therefore, granted as to this aspect of Plaintiff's Title VII claim.

## C.    Retaliation for Prior Report of Racial Discrimination

Before proceeding to the merits of the retaliation claim, the court considers whether Aughtry has exhausted her administrative remedies as to this claim. The concern arises because Aughtry did not check the "retaliation" box on the charge form and did not clearly suggest that she was pursuing such a claim in her brief description of the basis for the charges. *See generally Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 132 (4th Cir. 2002) (noting that "[t]he EEOC charge defines the scope of the plaintiff's right to institute a civil suit" but that "the scope of the civil action is confined only by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination"). "In other words, '[i]f a plaintiff's claims in her judicial complaint are reasonably related to her EEOC charge and can be expected to follow from a reasonable administrative investigation, the plaintiff may advance such claims in her subsequent civil suit.'" *Miles*, 429 F.3d at 491-92 (quoting *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247-48 (4th Cir. 2000)).

The only possible notice of a retaliation claim given by Aughtry's charging document is her general reference to a prior complaint of discrimination. This brief comment was not, however, made in a context which would fairly alert the District (or investigators) to any claim of retaliation. Instead, it merely appears to be offered to buttress her claim of disparte treatment.[28] The lack of notice is further supported by the EEOC notice to the District which, like the charging document, checked only the "race" box and not the "retaliation" box. Finally, the District's response addresses only a claim of disparate treatment. Bain Aff. Ex. 13-B. Thus, nothing in these documents suggests

---

[28] Aughtry's short statement of particulars included the following: "I contend my termination is a pretext. Prior to my termination, I complained that I was being subjected to discriminatory acts because of my race. . . . I therefore believe that I have been discriminated against because of my race (white)[.]" Bain Aff. Ex.11.

that a retaliation claim was either fairly predicted by Aughtry's administrative charge or was actually investigated. For all of these reasons, Aughtry's retaliation claim is procedurally barred.

Even if Aughtry's brief reference to an earlier complaint was enough to avoid a procedural bar, Aughtry's retaliation claim would fail for lack of any evidence of a causal connection between any claim of racial discrimination and her termination. Aughtry made only one complaint of racial discrimination prior to the date when she was placed on administrative leave on September 28, 2006 (immediately predating her termination). That complaint is found in the November 30, 2004, letter signed by Aughtry and two other employees. The significant (nearly two year) gap in time between this letter and Aughtry's termination prevents any causation inference based on a temporal connection.[29]

There are no other facts that would support an inference that the ill will which pervaded Aughtry and Goodson's continuing relationship resulted from this complaint. This is, in part, because the difficulties which followed Aughtry's signing of the letter appear to be of the same nature and degree as those predating (and complained of in) the letter. The only evidence of any change in Goodson's behavior after this letter was written is that there was at least a brief period of improvement. *See*, *e.g.,* Aughtry Dep. at 152-53. Moreover, it is clear that the District itself responded to the letter in an appropriate manner by investigating the claims including having an audit conducted by the State Department of Education.

Even if Aughtry could show that Goodson treated her more harshly after the November 30, 2004 letter, including by reporting Aughtry for conduct that ultimately led to her termination, it

---

[29] There is also no evidence that either of the other two signatories were terminated, demoted, or otherwise subjected to retaliation.

would not follow that the termination itself was retaliatory. This is because an independent group of three individuals made the termination decision. There is no evidence to suggest that any of these individuals were motivated by an intent to retaliate against Aughtry for a complaint she and two others made about Goodson some two years earlier (or for any other complaint for that matter). To the contrary, the only evidence of motivation for the termination is the District's consistently-maintained and well-supported claim that Aughtry was terminated because the three decisionmakers concluded that she (1) had a recent history of poor performance (growing worse over the last two years), (2) was insubordinate, and (3) left work without permission on September 27, 2006.[30]

For the reasons set forth above, Aughtry has failed to proffer evidence sufficient to support a retaliation claim under Title VII. Defendant's motion for summary judgment is, therefore, granted as to this final aspect of Aughtry's Title VII claim.

## II. Retaliation for Workers' Compensation Claim

Aughtry also alleges that she was terminated for filing one or more workers' compensation claims. Termination on this basis would be a violation of S.C. Code Ann. § 41-1-80. *See Hines v. United Parcesl Service, Inc.*, 736 F. Supp. 675, 677 (D.S.C. 1990). To establish this claim, Aughtry must show that she filed a claim, was discharged or demoted, and that there is a causal connection between the filing of the claim and the discharge or demotion. *Id*.; *Hinton v. Designer Ensembles,*

---

[30] The only inconsistencies relating to claimed motivation flow from Aughtry's varied arguments as to the possible reasons that Goodson might be treating her unfairly including reports of poor performance and the events on September 27, 2006. At or near the time of her termination Aughtry offered two different claims of retaliatory motivation: (1) Goodson's retaliation for Aughtry's reporting of Carter's embezzlement; and (2) Goodson's retaliation for Aughtry's September 18, 2006, grievance. She also mentioned racial discrimination to Madden at the time of her pre-termination hearing but did not mention that motivation in writing until she filed her administrative charges on November 7, 2006. The claim of retaliation for an earlier charge of discrimination was not raised (at the least, not clearly so),until this action was filed.

*Inc.*, 540 S.E.2d 94, 97 (2000) (adopting elements as stated in *Hines*). Plaintiff retains the burden of proving "but for" causation. *Hinton*, 540 S.E.2d at 97. As with the *McDonald Douglas* proof scheme, Aughtry may satisfy this burden either by "persuading the court that the discharge was significantly motivated by retaliation for her exercise of statutory rights, or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 97 (quoting *Wallace v. Milliken & Co.*, 406 S.E.2d 358, 360 (S.C. 1991)). "If the employer articulates a legitimate, nonretaliatory reason for the termination, the proximity in time between the work-related injury and the termination is not sufficient evidence to carry the employee's burden of proving a causal connection." *Id.*

The only evidence of causation is a relatively close-in-time link between Aughtry's latest workers' compensation claim and her termination.[31] This weak link is weakened further by the absence of any negative repercussions for her earlier filing of one or more workers' compensation claims and by the absence of even a single negative comment by any District employee about any of her workers' compensation claims. By contrast, the District has proffered strongly supported and uncontradicted evidence of a nondiscriminatory motivation for the decision which was made by three independent decisionmakers.

---

[31] Aughtry suggests an additional causative link between the termination and Aughtry's reinjury of her knee on September 27, 2009. That reinjury immediately preceded the altercation between Goodson and Aughtry which, ultimately, led to Aughtry's termination. As to this injury, Aughtry argues that "Goodson's lack of compassion for [Aughtry's] injuries speaks volumes." Dkt. No. 57 at 16. There is, however, no evidence that any reinjury on September 27, 2009 resulted in a new workers' compensation claim, and certainly not one filed prior to Aughtry's termination. Neither did the altercation involve any discussion (critical or otherwise) of Aughtry's filing of any prior workers' compensation claim. Instead, it focused on the need to have the lines manned for the students' imminent arrival. In other words, nothing in Goodson's alleged lack of compassion suggests that she was offended because Aughtry had filed (or might file an additional) workers' compensation claim.

Under these circumstances, any inference that any of the three decisionmakers (or the District through some other agent) was motivated to terminate Aughtry because of her workers' compensation claims would be based on pure speculation.[32]  Defendants' motion to dismiss the workers' compensation retaliation claim is, therefore, granted.

## III.    First Amendment Retaliation

**Allegations of Amended Complaint.**  Aughtry's final claim is a claim pursued under 42 U.S.C. § 1983 for violation of her First Amendment rights to free speech and association.  Amended Complaint ¶¶ 14-26.  Augthry alleges that these rights were violated because she was "harassed, and terminated . . . for false and pretextual reasons" in retaliation for her reporting "wrongful actions and illegalities."  *Id.* ¶¶ 15 & 19.   The only specifically identified report is her "report of embezzlement on the part of Martha Carter."  *Id.* ¶ 15.

Aughtry also alleges in this cause of action that the District has a "custom and practice" of "hiring and maintaining . . . personnel from other school districts who are associated by close friendship or other bonds and yet have demonstrated a lack of ability to properly manage or supervise and in fact in some cases [have] prior records of misconduct[.]"   Am. Complaint ¶ 21. She asserts that this "custom or practice also involves an agenda of pretextually ousting, terminating or forcing resignations of valued district employees with good employment records to make room for friends and associates of those in policy making and hiring positions to hire their friends and others who are not appropriately qualified." Am. Complaint ¶ 22.  Ultimately, she alleges that the

---

[32]  It is also of some note that Aughtry did not suggest this concern until this suit was filed. This is despite several written documents in which she alleged that her termination was the result of Goodson's retaliation for either (or both) Aughtry's report of Carter's embezzlement or Aughtry's earlier grievance against Goodson.

District's poor hiring practices, "made . . . in reckless disregard of [the hired individuals'] former histories . . . manifests deliberate indifference to the rights of citizens and is a practice so persistent and widespread as to constitute a custom and usage with the force of law." Am. Complaint ¶¶ 24-25.[33]

**Opposition Memorandum**. In her memorandum in opposition to summary judgment, Aughtry describes her Section 1983 claim similarly, citing primarily to the complaint rather than providing evidentiary support. *See* Dkt. No. 57 at 16-17. She further asserts that she and others "repeatedly reported" "misconduct of the same kind," but were rewarded only with [unspecified] retaliation. In a footnote, she describes her reports as including reports of (1) improper record keeping, (2) shortages of meal money, and (3) the disappearance of large amounts of food from the cafeteria. *Id.* n. 2 (citing her own deposition at pages 57-77, 146-51, 201-04, 250-52, Ex. 1. as well as depositions of others including Goodson Dep. at 42-44).[34] Of these, the first may refer to

---

[33] It is not at all clear what legal point Aughtry is attempting to make with these allegations. To the court's knowledge, the First Amendment has never been interpreted to guarantee wise hiring decisions by governmental employers.

[34] Despite the large number of pages cited from Aughtry's deposition, only three pre-termination reports are actually identified. These include: (1) the November 2004 letter to the District's Human Resources Director signed by Aughtry and two other employees (Aughtry Dep. at 146-51); (2) Aughtry's report to Madden in 2003 or 2004 that she believed Carter and Goodson were improperly ringing up prepayments as meals served (*id.* at 67-69); and (3) Aughtry's report to Goodson about other employees taking food (*id.* at 251-52). Aughtry testified that Madden responded to the report regarding how meals were being rung up ((2) above) by stating that he would discuss the matter with Goodson (and Carter). *Id.* at 69, 250-51. Aughtry does not know if he did so, but does know the practice continued. She did not report the problem again to Madden or to anyone else until after her termination. *Id.* at 70-71, 73, 201-04 (post-termination report of the same concern to Dr. Anderson). There is no indication of how Goodson responded to the one report made to her of theft by other employees.

The remainder of the cited pages do not refer to any "reports" of wrongdoing. Instead, they refer to alleged misdeeds by Goodson, a number of which are based on hearsay or speculation. *See id.* at 58 (asserting that Goodson "has a history of taking stuff" and that Warner "went in the cooler one day and caught" Goodson and Carter (doing what is not clear)). Aughtry also testified that she

35

Aughtry's report to Madden that she felt Goodson and Carter were improperly ringing up pre-payments for meals as meals served. *Supra* n. 34. The second appears to refer to Aughtry's report of Carter's embezzlement. The third refers to matters which were either not reported, or were reported to Goodson but related to other employees. *Id.*

Aughtry then proceeds to argue, in a haphazard if not nonsensical manner, as follows:

> Plaintiff testified she was ousted because of her various reports of Goodson's conduct as previously mentioned and Plaintiff's involvement with reporting Goodson's friend Martha Carter's theft of the School deposits. (Aughtry Dep. pp. 210-229). This further solidifies the fact that there was a custom or practice which violated the Plaintiff's constitutional rights, as well as Goodson's retaliatory animus toward the Plaintiff.

> [subsection heading deleted]

> Plaintiff has established a violation of her constitutional rights. As previously discussed, the Defendants "retaliated, harassed, and terminated the plaintiff for false and pretextual reasons." This was proximately caused by the Plaintiff's reporting of misconduct, fraud and theft. (Aughtry Dep. pp. 210-2299). Such actions have violated Plaintiff's constitutional rights. As a cafeteria manager, it was her duty to report such actions.

> The retaliation and harassment Plaintiff suffered from her superiors for her reports of Carter's misconduct as well as Goodson's misconduct violated her rights of freedom of association and freedom of speech. Plaintiff clearly felt "there's a lot of stuff the district don't [sic] want the public to know." (Aughtry Dep. p. 210). It appeared to the Plaintiff that the District was attempting to coverup [sic] her complaints about Carter. (Aughtry Dep. pp. 224-225).

Dkt. No. 57 at 17-18.

**First Amendment Retaliation in Employment.** As summarized above, Aughtry's First Amendment claim rests on the premise that "public employees do not surrender all their First

---

believed Goodson had taken some barbeque sauce from the cafeteria, but conceded this belief was neither supported by hard evidence or, more critically, reported to anyone. *Id.*. at 59-62. Aughtry did claim to have first hand evidence that Goodson's children were allowed to take drinks and snack food from the cafeteria and that Goodson may have used school funds to purchase an item for her son to take to school, but she conceded she did not report these concerns to anyone. *Id.* at 60-61, 66, 74-76.

Amendment rights by reason of their employment.  Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006) (citing *Connick v. Myers,* 461 U.S. 138, 147 (1983); *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U.S. 563, 568 (1968)).

> *Pickering* and the cases decided in its wake identify two inquiries to guide interpretation of the constitutional protections accorded to public employee speech. The first requires determining whether the employee spoke as a citizen on a matter of public concern. . . .  If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. . . . If the answer is yes, then the possibility of a First Amendment claim arises. The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public. . . . This consideration reflects the importance of the relationship between the speaker's expressions and employment. A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations.

*Garcetti*, 547 U.S. at 418 (internal citations omitted).  In light of these considerations, the Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421.

To the extent Aughtry relies on her alleged reports of accounting irregularities, whether Carter's embezzlement of funds or Goodson's inappropriate method of ringing up prepayments, her First Amendment claim fails under the rule laid down in *Garcetti*.  This is because Aughtry's official duties included responsibility for the cafeteria accounts which, necessarily, included a duty to report accounting irregularities.

Even if the alleged reports did not fall within her official duties, there is no evidence of causation. That is, there is no evidence that Aughtry was terminated because of any report of

impropriety by Carter, Goodson, or anyone else.  As her memorandum reveals, Aughtry rests her claims of causation on repetition of the allegations of the complaint, general references to nonspecific reports of misconduct, and testimony as to her own suspicions and assumptions.  None of the cited evidence supports an inference that Aughtry was terminated for any reason other than the legitimate reasons stated by the District as discussed in the preceding sections of this order.

For example, Aughtry refers to her April 2005 report of embezzlement by Carter.  There is, however, no evidence that Goodson (or anyone else in the District) treated Aughtry differently following this incident: Aughtry's relationship with Goodson was poor before the report and continued to be poor in much the same way following the report.[35]  Further, Aughtry's report of Carter's embezzlement occurred in April 2005.  This was roughly seventeen months before her termination.  Thus, there is no close temporal link.  Aughtry's claim of a friendship between Carter and Goodson (particularly one strong enough to support retaliation) is, likewise, without evidentiary support.  Most critically, there is no evidence that any of the three individuals who made the decision to terminate Aughtry had any reason to view Aughtry's report of Carter's crime against the District negatively.  Aughtry relies solely on her personal and unsupported view that there was [unspecified] "stuff the district don't want the public to know."

There is, likewise, no evidence that Aughtry's other alleged report of wrongdoing resulted in any change in the relationship between Aughtry and Goodson (or any other District employee including the three decisionmakers). These reports included Aughtry's report to Madden relating to how Goodson was ringing up prepayments or her report to Goodson that other employees might

---

[35]  Aughtry's relationship with Goodson was already so bad that, when she first discovered the missing deposits, Aughtry suspected Goodson and Carter of committing the crime in order to set Aughtry up for a fall.  Aughtry also advised Goodson that this was her reason for reporting the matter to the District office rather than to Goodson, her immediate supervisor. These circumstances as well as other evidence suggest a relationship that was already seriously compromised.

be taking food from the cafeteria.

Finally, for reasons discussed in preceding sections, the only evidence of the decisionmakers' (as opposed to Goodson's) motivation for the termination is that they concluded that Aughtry had a recent history of poor performance and had, on September 27, 2009, been insubordinate and left work without permission. There is no evidence to contradict these stated legitimate reasons for Aughtry's termination and much to support them.

For all of these reasons, the court concludes that there is no evidence to support any claim that the District violated Aughtry's First Amendment rights through her termination or otherwise.

## CONCLUSION

For the reasons set forth above, the court grants Defendants' motion for summary judgment in full. The Clerk of Court is directed to enter judgment in Defendants' favor.

IT IS SO ORDERED.

S/ Cameron McGowan Currie
CAMERON MCGOWAN CURRIE
UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
July 29, 2009